IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

CITY OF TOLEDO,

                Plaintiff,              Case No. 3:01 CV 7165

  -vs-

                                              MEMORANDUM OPINION

RANDALL FUNDING &
DEVELOPMENT, LLC, et al.,

                Defendant.

KATZ, J.

    This matter is before the Court on the motion for summary judgment of Defendant Randall Funding and Development, LLC ("Randall"). (Doc. No. 66.) Plaintiff has filed a response (Doc. No. 70), and Defendant Randall has filed a reply. (Doc. No. 70.) This Court has jurisdiction pursuant to 28 U.S.C. § 1332. For the reasons that follow, this Court grants Defendant's motion.

### **BACKGROUND**

    Plaintiff, City of Toledo ("the City"), seeks to recover from Randall for breach of either of two contracts. The first is a two-year contract between Defendant Griffin Grant Writing & Consulting, Inc. ("GGW&C") and the City for grant writing services. (Doc. No. 68, Exhibit A.) The City claims that (1) GGW&C breached its duties under this contract, and (2) assigned those duties to Randall, and therefore, Randall is liable for its breach. The second is a Servicing Agreement between GGW&C and Randall, in which Randall agreed to service GGW&C's contract with the City. The City claims that breach of its original contract with GGW&C constitutes a breach of GGW&C's agreement with Randall, and therefore, the City is entitled to

recover as a third-party beneficiary. In the alternative, the City seeks recovery from Randall for unjust enrichment. The details of these contracts are as follows.

**A.    The Contract Between the City and GGW&C**

On January 26, 1999, the City and GGW&C executed a contract for grant writing services. It requires the City to pay GGW&C a $95,000 retainer fee, and GGW&C to "raise a minimum of $1,000,000 in new grant funds for the City within twenty-four (24) months of [its] effective date," or forfeit the retainer fee. (Doc. No. 68, Exhibit A at 2.) The priority areas the contract identifies are: (1) Criminal Justice Technology and Programs; (2) Other Technology; (3) Housing and Housing Programs; (4) Transportation; (5) Infrastructure; (6) Social Services; (7) Health Services; and Other areas/departments, as mutually agreed upon by both parties. (Doc. No. 68, Contract Between the City and GGW&C, at 2-3.)

Section V of the contract, entitled "Scope of Services," details the manner in which GGW&C must meet its objectives. (Doc. No. 68, Contract Between the City and GGW&C, at 3-7.) Specifically, Section V(C) states that GGW&C must first research potential funding sources for the City and explore them at an assessment meeting within 30 days of the contract's execution. Second, GGW&C must provide the City with an initial report of potential funding sources within the later of 45 days of the assessment meeting or contract execution. Third, the City must "discuss this 'initial' report to determine the most efficacious funding sources for each project and priority defined in [the contract]." (Doc. No. 68, Contract Between the City and GGW&C, at 4.) Fourth, within 10 days of the City's discussion, GGW&C must "cull out those sources that are not efficacious as defined from the discussion" and generate a final report "listing sources mutually agreed upon [that] should be considered for authorization for the duration of [the contract], subject to the availability of, and appropriations to, each source identified in the plan." (Doc. No. 68, Contract Between the City and GGW&C, at 4.) In addition to the sources identified in its "final

2

report," Section V(D) states that GGW&C must submit a weekly "Federal Grants Alert," listing additional potential funding sources. However, GGW&C must obtain the City's approval before applying for any grants.

The essential provisions of the City's obligations under this contract are set forth in Section VI of the contract, entitled "Reasonable Opportunity." That section states that the "City shall provide [GGW&C] a reasonable opportunity to solicit grant funding," and defines "reasonable opportunity" as accepting "a minimum of $3,500,000 in grant sources offered to City by [GGW&C] through the 'Federal Grants Alert' within ten (10) months from the date of execution of [the contract]." (Doc. No. 68, Contract Between the City and GGW&C, at 7-8.) In addition to the $95,000 retainer fee, the contract states that the City shall pay GGW&C's costs and expenses, and a 10% incentive payment for "all such funding awarded to City above $1,000,000." (Doc. No. 68, Contract Between the City and GGW&C, at 9-12.) If the City fails to provide a "reasonable opportunity" to GGW&C to obtain grants, Section VII(F) gives GGW&C the option to either "[c]alculate a pro-rated guarantee based on 10% of the grants authorized by City during the ten (10) month period; or [c]alulate fees for services provided during the term of the Agreement, or until terminated at a rate of $120 per documented hour, not to exceed $95,000 in fees."

The contract includes three additional provisions that are pertinent to this suit. First, the choice of law provision, Section XIII(O), which mandates that Ohio law governs the contract. Second, the non-assignment clause, Section XIII(J), which reads:

> Neither this Agreement nor any portion thereof may be sub-Agreemened or assigned without the express prior written consent of City. City understands and agrees that [GGW&C] uses and has maintained relationships with subcontractors who perform research and writing services. City in no way intends to mandate the manner in which [GGW&C], as an independent contractor, achieves the goals and outcomes set forth under this Agreement.

3

(Doc. No. 68, Contract Between the City and GGW&C, at 20.) Third, the termination clause, Section XII, provides for termination by either party: (1) upon 10 days' notice for material breach; or (2) upon 15 days' notice for convenience. (Doc. No. 68, Contract Between the City and GGW&C, at 15.) In the event of a material breach, the contract states that the breaching party shall have 10 days to cure. (Doc. No. 68, Contract Between the City and GGW&C, at 15.)

**B.     The Servicing Agreement Between GGW&C and Randall**

The second contract at issue in this case is the Servicing Agreement ("Agreement"), executed between GGW&C and Randall on June 17, 2000. (Doc. No. 68, Servicing Agreement.) This Agreement states that Randall will service GGW&C's pending grant writing contracts "in the manner in which those Contracts have customarily been serviced by [GGW&C]." (Doc. No. 68, Servicing Agreement, Section 1.) The Agreement further provides that "[i]t is mutually understood and agreed that [Randall] is a contractor of [GGW&C], and [Randall] is not assuming any liability to [GGW&C's] clients in connection with this Servicing Agreement." (Doc. No. 68, Servicing Agreement, Section 1.) "Exhibit A" to the Agreement identifies the City of Toledo as one of the contracts it covers. In consideration for servicing GGW&Cs contract with the City, the Agreement provides for Randall to receive 70% of the 10% incentive payment for all grants awarded to the City above $1,000,000, and the right to negotiate for its own contract with the City. (Doc. No. 68, Servicing Agreement, Section 1.3.) This Agreement is governed by California law. (Doc. No. 68, Servicing Agreement, Section 7.)

**C.     Performance of the Contracts**

According to the information submitted by Randall, GGW&C identified fourteen grant opportunities for the City in the following areas:

1. <u>Environment</u>: Three totaling $1.5 million, and one for an unspecified amount;
2. <u>Criminal Justice Technology and Programs</u>: Two totaling $3,125,000, and one for an unspecified amount;
3. <u>Fire Department</u>: One for $1,775

4

    4. <u>Social Services</u>: One for $4,500
    5. <u>Education</u>: One with a range of funding from $35,000 to $2 million; and
    6. <u>Housing and Youth Programs, Transportation, and Disabilities</u>: Four total opportunities, each for unspecified amounts.

(Doc. No. 68, Funding Inquiries Log.) Of these opportunities, the City authorized three-one for the fire department, one for social services, and one for the environment-for a total of $206,233 in authorized funds, from which it received $205,675 in grants. (Doc. No. 68, Grant Status Report.) Although the time logs submitted by Randall show that GGW&C submitted regular, but not weekly, Federal Grants Alerts to the City, it does not list any new grant opportunities identified after March 27, 2000. (Doc. No. 68, Funding Inquires Log and GGW&C Time Log.)

       The City does not explain why it chose not to pursue the remaining eleven grant opportunities GGW&C identified. Instead, it states generally that the grant opportunities were not useful, which it supports by memoranda from various City departments—notably unrelated to the environment or criminal justice technology programs—indicating that they have not used GGW&C's services in obtaining grants. (Doc. No. 71, Exhibit 2.) Some of the reasons stated for the respective departments' decisions not to use GGW&C are: that they have not found the opportunities useful; that they have their own grant writing staff and therefore do not wish to pay ten percent for GGW&C's services; or that grants are not typically available for their types of projects. (Doc. No. 71, Exhibit 2.)

       According to the record before this Court, the first performance issue the City claimed under their contract arose on August 8, 2000, when Randall sent a letter to the City, informing them that: (1) GGW&C had ceased operations; and (2) Randall had agreed to service GGW&C's existing contracts. (Doc. No. 68, Aug. 8 letter.) In the letter, Randall asked the City to authorize Randall to service GGW&C's contract with the City, and to submit all future payments under the contract directly to Randall. (Doc. No. 68, Aug. 8 letter.) Although the City did not initially respond, there is no dispute that Randall did service GGW&C's contract as promised. In his

5

affidavit, Daniel J. Randall states "Randall funding continued to provide the City of Toledo with Federal Grants Alerts in an attempt to provide the City of Toledo with further funding opportunities." (Doc. No. 68, Randall Affidavit.) In the City's memorandum in opposition to Randall's motion for summary judgment, it states that it "allowed [Randall] to continue sending federal grant alerts. . . [and] allowed this to go on until November 2000." (Doc. No. 70, at 10.)

The City finally responded to Randall via letter dated November 2, 2000—two and a half months before the scheduled expiration of its contract with GGW&C. (Doc. No. 68, Nov. 2 letter.) The letter stated the City's desire to terminate its contract with GGW&C pursuant to the contract's "Termination for Convenience" clause, Section XII(C). (Doc. No. 68, Nov. 2 letter.) Its reasons for terminating the contract were that (1) the City "has not found this Agreement useful in identifying and obtaining grant funds"; and (2) "that GGW&C has violated Section XIII(J) of the agreement by assigning this contract to [Randall]." (Doc. No. 68, Nov. 2 letter.) Randall responded by letter, dated December 7, 2000, enclosing the list of grant opportunities noted above, and time logs totaling 787.50 hours expended on grant writing for the City. (Doc. No. 68, Dec. 7 letter.) The final correspondence on record between the City and Randall was on January 4, 2001, in which the City confirmed receipt of Randall's time logs, and calculated the refund due as $500. (Doc. No. 68, Jan. 4 letter.)

The City filed a diversity suit in this Court for breach of contract against both GGW&C and Randall on April 3, 2001, which it amended on October 2, 2001, to add GGW&C's insurer, Frontier Insurance Company, as an additional defendant. (Doc. Nos. 1, 16.) This Court granted the City's motion for a default judgment against GGW&C on April 15, 2002, in the amount of $75,430, with costs and interest. (Doc. No. 25.) The City subsequently settled the judgment with Frontier Insurance Company. (Doc. No. 70 at 4.) Randall moved for summary judgment on

6

October 28, 2005 (Doc. No. 66), the City opposed the motion on November 28, 2005 (Doc. No. 70), and Randall replied on December 6, 2005. (Doc. No. 72.)

## DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (*quoting* FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000). "If a contract's terms are clear and unambiguous, a court may grant summary judgment since contract interpretation is a matter of law." *Sekerak v. Nat'l City Bank*, 342 F. Supp. 2d 701, 706 (N.D. Ohio 2004).

**B.     Assignment of GGW&C's Contract with the City**

The first issue this Court must consider is whether GGW&C assigned its original contract with the City to Randall, and, if so, whether the assignment imposed liability upon Randall as assignee. "It is well established that a contract is binding only upon the parties to the contract and those in privity with them and that an action for breach of contract can be maintained only by the parties to the contract or those deriving rights from the contracting parties." *Ohio Sav. Bank v.*

*H.L. Vokes Co.*, 560 N.E.2d 1328, 1332 (Ohio Ct. App. 1989). Because Randall was not a party to the original contract, it cannot be liable to the City for its breach unless, as the City claims, it was an assignee. However, the express terms of GGW&C's contract with the City preclude its assignment absent consent and neither GGW&C nor Randall manifested an intent to create an assignment. Accordingly, there is no basis for this Court to find that GGW&C assigned its contract with the City to Randall.

As the City points out in its opposition to summary judgment, its contract with GGW&C "provided that assignment without consent of the City was prohibited," and the City admits that it "did not give the Defendant, GGW & C, Inc. prior written consent to assign the Defendant, GGW & C, Inc.'s obligation under the parties' agreement to anyone." (Doc. Nos. 1, 70 at 3.) Contractual provisions prohibiting assignment are valid. *Riley v. Hewlett-Packard Co.*, 36 Fed. App'x. 194, 199 (6th Cir. 2002) (enforcing a non-assignability clause because "[t]here is no reason whatsoever to void a valid contract clause entered into by equal partners"); s*ee also* Restatement (Second) of Contracts §§ 318(1) and 317(2) ("An obligor can properly delegate the performance of his duty to another unless the delegation is contrary to public policy *or the terms of his promise*," and "A contractual right can be assigned unless . . . assignment is validly precluded by contract"). Thus, this Court finds that GGW&C lacked the power to assign its contract and any attempt to assign the contract to Randall would have been ineffective.

Despite the unambiguous terms of the contract's non-assignment provision, the City urges this Court to, nevertheless, find an assignment because if "no assignment occurred, the logical conclusion is that the City will be unable to hold anyone liable for the non-performance of this Agreement." (Doc. No. 70, at 7). This argument is as absurd as it is meritless. Both GGW&C and its insurance company were joined as defendants in this action. The fact that the City is

9

unhappy with the settlement it obtained from them in no way grants it a legal right to seek recovery from Randall.

Furthermore, neither GGW&C nor Randall manifested an intent to assign, nor did Randall manifest an intent to assume GGW&C's liabilities to the City. An assignment requires "intent on the part of the assignor to assign the rights in question, and an intent on the part of the assignee to be assigned the rights in question." *Quantum Chem. Corp. v. Mobil Oil Corp.*, Nos. C-940357, C-940395, 1995 Ohio App. LEXIS 4557, at *8 (Oct. 18, 1995). The Agreement between GGW&C and Randall stated "[i]t is mutually understood and agreed that [Randall] is a contractor of [GGW&C], and [Randall] is not assuming any liability to [GGW&C's] clients in connection with this Servicing Agreement." (Doc. No. 68, Randall Agreement, Section 1.) Under Ohio law:

> The general rule is that an assignment does not cast upon the assignee any affirmative liability on the contract assigned unless there is an assumption of the assignor's obligations under the contract. . . . In an action between the obligor and the assignee the claims of breach of warranty or breach of contract are available only defensively; if the obligor seeks damages or restitution he must go directly against the assignor.

*Litton ABS v. Red-Yellow Cab Co.*, 411 N.E.2d 808, 810 (Ohio Ct. App. 1978) (citing *American Natl. Co. v. Thompson Spot Welder Co.*, 164 N.E. 435, 436 (Ohio Ct. App. 1928)). Under the plain language of its Agreement with Randall, GGW&C maintained full liability for its contractual obligations to the City. Therefore, the City cannot hold Randall liable for its breach.

**C.   Randall's liability to the City under Randall's Agreement with GGW&C**

The second issue this Court must consider is whether the City can seek damages from Randall as a third-party beneficiary of Randall's Agreement with the City. Randall's Agreement with GGW&C is governed by California law. (Doc. No. 68, Randall Agreement, Section 7.) Under California law:

> "Where one person for a valuable consideration engages with another to do some act for the benefit of a third person. . . the party for whose benefit the contract or

10

>  promise was made, or who would enjoy the benefit of the act, may maintain an action against the promisor for the breach of his engagement."

*Mercury Casualty Co. v. Maloney*, 113 Cal. App. 4th 799, 802 (Cal. Ct. App. 2003) (quoting *Johnson v. Holmes Tuttle Lincoln-Mercury*, 160 Cal. App. 2d 290, 296-97 (Cal. Ct. App. 1958)). However, "[f]or a third party to qualify as a beneficiary under a contract, the contracting parties must have intended to benefit that third party, and their intent must appear from the terms of the contract." *Kirst v. Silna*, 103 Cal. App. 3d 759, 763 (Cal. Ct. App. 1980). Although Randall and GGW&C specifically identified GGW&C's contract with the City as one of the contracts Randall would service under their Agreement, Randall also expressly disclaimed any liability to third parties and an unambiguous intent not to create any third party beneficiaries. (Doc. No. 68.) Accordingly, this Court finds that the City was not a third party beneficiary of Randall's Agreement with GGW&C. *See Commercial Nat'l Bank v. Superior Court*, 14 Cal. App. 4th 393, 408 (Cal. Ct. App. 1993) (finding no liability where the parties "expressly disclaim[ed] any intent to create any other third party beneficiary or contractual obligation").

Even if this Court were to find that the City was a third party beneficiary of Randall's Agreement with GGW&C, the City has not shown that Randall breached the Agreement. The City claims that Randall's Agreement with GGW&C bound it to the same terms as GGW&C's original contract with the City, which it breached by (1) accepting the assignment, and (2) failing to raise $1 million in new grant funding for the City within 24 months. However, the City has not established either assignment of the original contract or breach of the services GGW&C agreed to perform. Accordingly, there is no breach of either contract at issue in this case on which the City can seek damages.

A review of the record in this case does not support a conclusion that GGW&C breached its original contract with the City. "Under Ohio law, a plaintiff alleging breach of contract must demonstrate 1) the existence of a contract; 2) performance by the plaintiff; 3) breach by the

11

defendant; and 4) damages." *Goodman v. Cisco Sys.*, 148 Fed. App'x. 378, 381 (6th Cir. 2005). The city has failed to establish either its performance or GGW&C's breach. Randall has set forth evidence to show that GGW&C presented the City with approximately $5 million in grant opportunities within ten months of the original contract's execution and both GGW&C and Randall continued to provide the "Federal Grants Alerts" on a regular basis. (Doc. No. 68, Grant Status Report, Funding Inquiries, and GGW&C Time Logs.) However, the City has not offered any reason why it authorized GGW&C to pursue only $206,233 and failed to pursue the remaining identified grant opportunities as its contract with GGW&C required. (Doc. No. 68, Grant Status Report and Funding Inquiries Log.) It does not appear to this Court that the memoranda the City submitted were from the departments for which GGW&C identified funding sources, (Doc. No. 71, Exhibit 2), and the City's vague allegations that it did not find GGW&C useful in identifying new grant opportunities are inadequate to survive a motion for summary judgment.

Furthermore, the City prematurely terminated its contract with GGW&C, without notice, in express violation of its termination provision. (Doc. No. 68, GGW&C Contract at 16, and Nov. 2 letter.) Even though the City claimed it was terminating the contract for breach of its non-assignment provision, "a violation of the non-assignment provision in [a] contract cannot provide a legal justification for [plaintiff's] failure to perform under the contract." *Quantum*, 1995 Ohio App. LEXIS 4557, at *9-10. Under the express terms of the original contract, GGW&C had a duty to obtain $1 million in new funding sources "within twenty-four (24) months of [the contract's] effective date." (Doc. No. 68, Exhibit A at 2.) However, the City terminated the contract on November 2, 2000—approximately 21 months after its execution. Because the City has not argued or presented any evidence to show that GGW&C would be unable to fulfill its obligation within 24 months as it originally agreed, it has not demonstrated that GGW&C was in breach on the termination date.

For these reasons, this Court does not find that either GGW&C or Randall were in breach of either the original contract between GGW&C and the City, or the subsequent Agreement between GGW&C and Randall. Accordingly, the City's breach of contract claims against Randall are without merit.

**D.     Unjust Enrichment**

The City's final claim against Randall for unjust enrichment is also without merit. There are three elements of a successful claim for unjust enrichment: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *Goodman*, 148 Fed. App'x. at 382 (quoting *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984). Because the City has not offered any evidence to show that it conferred a benefit upon Randall, it cannot, as a mater of law, succeed on a claim of unjust enrichment.

## CONCLUSION

Defendant Randall's motion for summary judgment (Doc. No. 66) is granted.

IT IS SO ORDERED.

                                              S/ *David A. Katz*
                                              DAVID A. KATZ
                                              U. S. DISTRICT JUDGE